## UNITED STATES DISTRICT COURT
## <u>DISTRICT OF MASSACHUSSETS</u>

_____

| | |
|---|---|
| ERIC J. GOLDEN, derivatively on behalf of ) | |
| THE PRINCETON REVIEW, INC., ) | |
| ) | |
| Plaintiff, ) | JURY TRIAL DEMANDED |
| ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | |
| DAVID LOWENSTEIN, JEFFREY R. CRISAN, ) | |
| RICHARD KATZMAN,  MICHAEL A. KRUPKA, ) | |
| MICHAEL PERIK, JOHN S. SCHNABEL, DAVID L. ) | |
| WARNOCK, LINDA WHITLOCK, and ROBERT E. ) | |
| EVANSON, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| ) | |
| And, ) | |
| ) | |
| THE PRINCETON REVIEW, INC., ) | |
| ) | |
| Nominal Defendant. ) | |
| ) | |

_____


### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT


Plaintiff Eric J. Golden ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant The Princeton Review, Inc. ("Princeton Review" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") seeking to remedy defendants' breaches of fiduciary duties from March 12, 2009 to March 11, 2011, inclusive (the "Relevant Period").

## **NATURE OF THE ACTION**

1.      Princeton Review is a provider of in-person, online and print education products and services targeting the high school and post-secondary markets.

2.      Throughout the Relevant Period, defendants made materially false and misleading statements concerning Princeton Review's revenues, earnings and business operations. Specifically, defendants issued a series of materially false and/or misleading statements in which they failed to disclose, among other things that:  (a) the Company's revenues and  earnings were negatively impacted by operational problems and increased competition; (b) the Company shifted its focus and resources away from core higher education readiness to unproven projects to the detriment of the business; (c) contrary to the Company's public statements, the Company was not executing well on its turn-around plan; (d) the Company encountered significant  problems in the higher education readiness business due to a product mix shift and increased competition; and (e) defendants' positive statements about the Company were materially false and misleading.

3.      When the true nature of the Company's business and operations were disclosed to the public in a series of announcements on March 9 and 10th, 2011, the price of Princeton Review stock significantly declined. Princeton Review stock dropped 37.80% from $0.82 per share to $0.51 per share on March 10, 2011 and then declined another 23.53% on March 11, 2011, to close at $0.39 per share. The stock continued to drop thereafter, and as of August 4, 2011, it closed at $0.20 per share.

4.      Defendants harmed the Company by causing it to issue materially false and misleading statements and omit material facts, resulting in a loss of significant Company value, and by exposing Princeton Review to federal securities violations.  Indeed, as a result of

defendants' wrongful acts and omissions, Company is now exposed to millions of dollars in defense costs and potential liability.

5.      Plaintiff seeks to recover damages suffered by the Company as a result of the wrongful acts of its directors and officers described herein.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.   This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).   This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

7.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.   One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

8.      Plaintiff, a resident of Indiana, is a current shareholder of Princeton Review and has continuously held Princeton Review stock at all relevant times.

9.      Nominal defendant Princeton Review is a Delaware corporation located at 111 Speen Street, Suite 550, Framingham, Massachusetts 01701.   Princeton Review is a provider of

in-person, online and print education products and services targeting the high school and post-secondary markets.

10.     Defendant David Lowenstein ("Lowenstein") has served as a director of the Company since 2007 and Chairman of the Board since 2008. Lowenstein is a member of the Company's audit committee.   Upon information and belief, Lowenstein is a citizen of Massachusetts.

11.     Defendant Jeffrey R. Crisan ("Crisan") has served as a director of the Company since July 2007.  Upon information and belief, Crisan is a citizen of Massachusetts.

12.     Defendant Richard Katzman ("Katzman") has served as a director of the Company since 1985. Upon information and belief, Katzman is a citizen of Massachusetts.

13.     Defendant Michael A. Krupka ("Krupka") has served as a director of the Company since July 2007. Upon information and belief, Krupka is a citizen of Massachusetts.

14.     Defendant Michael Perik ("Perik") serves as President, Chief Executive Officer, and a director of the Company from July 2007 until his resignation on March 8, 2011. Upon information and belief, Perik is a citizen of Massachusetts.

15.     Defendant John S. Schnabel ("Schnabel") has served as a director of the Company since December 2009. Upon information and belief, Schnabel is a citizen of New York.

16.     Defendant David L. Warnock ("Warnock") has served as a director of the company since March 2010.  Upon information and belief, Warnock is a citizen of Maryland.

17.     Defendant Linda Whitlock ("Whitlock") has served as a director of the Company since April 2009. Whitlock is a member of the Company's audit committee. Upon information and belief, Whitlock is a citizen of Massachusetts.

18.     Defendant Robert E. Evanson ("Evanson") served as a director of the Company from June 2005 until June 2011. Evanson was a member of the Company's audit committee. Upon information and belief, Evanson is a citizen of Massachusetts.

19.     Collectively, defendants listed in paragraphs 10-18 shall be referred to herein as the "Individual Defendants."

20.     Collectively, defendants Evanson, Lowenstein and Whitlock shall be referred to as the "Audit Committee Defendants."

## FACTUAL ALLEGATIONS

21.     Princeton Review is a provider of in-person, online and print education products and services targeting the high school and post-secondary markets.

22.     On July 24, 2007, the Company announced that defendant Perik would become the new CEO of the Company, effective immediately. Perik succeeded the company's founder, defendant Katzman, who would remain as Executive Chairman.  In addition, the Company announced that that it had reached a definitive agreement with Bain Capital Ventures and Prides Capital under which the two private investors have made a $60 million of preferred stock investment in the company.

23.      Defendant Perik was brought in to help turn around the Company, which had been performing poorly in 2007. "The investments by Bain Capital Ventures and Prides Capital, and the addition of Michael Perik to the management team, are transformative events for The Princeton Review," stated Katzman in the press release announcing the news. "This transaction will materially improve the company's balance sheet, including retiring the company's Series B-1 Convertible Preferred Stock that had been outstanding. It will also give the company the flexibility to fully capitalize on a number of important opportunities in the industry, as we place

a renewed emphasis on expanding the geographic and product footprint of our core test prep franchise," Katzman stated.

24.     On March 12, 2009, the Company issued a press release announcing its financial results for 2008.  For the year, the Company reported that revenue increased 25.5% to $138.8 million, up from $110.6 million in 2007. The Company also reported income from continuing operations before taxes of $1.3 million for the year compared to a loss of $31.4 million in 2007. In the press release, Defendant Perik commented on the financial results, stating, in part:

> The Princeton Review made significant progress in 2008. Our financial results and key metrics underscore the operational and financial improvements we have made in turning around the business. Importantly, we also assumed greater control over brand management and promotion, and streamlined operations as we continue to transform and enhance the business.

25.     The press release also discussed the Company's revenue and earnings expectations for 2009, and provided as follows:

> For the full year 2009, the Company expects revenue growth to be between 16% and 20% including the full year results from the Company's remaining domestic franchises that were acquired in 2008. The Company also expects earnings before interest, taxes, depreciation and amortization (EBITDA) to be between 10% and 13% of our revenues in 2009.

26.     On March 16, 2009, Princeton Review filed its 2008 Annual Report on a Form 10-K with the SEC.  The 2008 Annual Report discussed the Company's restructuring efforts, stating as follows:

> **Restructuring**
> In 2007, we initiated a restructuring effort which resulted in restructuring expenses of $8.9 million and $2.2 million for the years ended December 31, 2007 and 2008, respectively. The costs incurred related to the relocation of our finance and certain legal operations from New York City to offices located near Boston, Massachusetts, and the consolidation of the remaining New York offices. The relocation was undertaken in order to improve the financial reporting process and to continue remediation efforts related to material weaknesses we previously reported in our Annual Report on Form 10-K for the fiscal year ended December 31, 2007.

We announced and commenced a restructuring initiative in the first quarter of 2009 related to our decision to outsource our information technology operations, transfer the majority of remaining corporate functions located in New York City to our offices located near Boston, Massachusetts, and simplify our management structure following the sale of the K-12 Services Division. The Company expects to incur approximately $3.0 million of charges related to these actions consisting of severance benefits for terminated employees and consulting fees related to transition of information technology operations to a third party. The Company expects to record the majority of these expenses and make related cash payments over the first and second quarters of 2009.

27.     On May 7, 2009, the Company issued a press release announcing its financial results for the first quarter of 2009.  For the quarter, the Company reported revenue increased 25.5% to $44.8 million, up from $35.7 million in 2008. The Company also reported income from continuing operations before taxes of $2.2 million compared to $0.3 million in 2008.  In the press release, Defendant Perik commented on the financial results, stating in part:

Our financial performance in the first quarter demonstrates the continuing progress we have made in moving toward our goal of returning The Princeton Review to sustainable profitability. The positive impact of operational changes made in 2008 are being felt and we are pleased with our revenue and margin performance during this quarter and the reduction of corporate expenses compared to the first quarter of 2008, especially in light of overall economic conditions.

28.     On May 7, 2009, the Company held a conference call to discuss the earnings announcement. During the call, Defendant Perik spoke positively about Company's progress and stated the following:

**Michael Perik** – *Princeton Review – Chairman and CEO*
Thank you, Steve. The Princeton Review's management is pleased with the results of this quarter. In a challenging economic environment I think we've made substantial progress on the year-over-year basis. But quarters, of course, only tell you what happened in the past. I think we are equally pleased when we look forward. Our enrollment growth is strong, our successful National Testing Day initiative, which I discussed, and our strong institutional pipeline are giving us confidence that 2009 will be the most successful year that the Princeton Review has ever had. And with that, Steve and I would be happy to take any questions.

\* \* \*

**Jason Anderson** – *Stifel Nicolaus – Analyst*
Okay, great. A thought, too -- in Test Prep, looking into the growth there, you guys, I think you talked about seeing some organic growth this year. It doesn't appear there was any this quarter. Is that somewhat of a seasonal thing, or do you still have that view here for '09? Do we expect to see some organic growth?

**Michael Perik** – *Princeton Review – Chairman and CEO*

\* \* \*

So I think we are – as I said in my closing remarks, we're quite confident on the back end of the year. We're at a point now in May where over half of the enrollments for the year have been already booked. So our visibility starts to get better and better with every week, and I think we like where things are headed right now.

29.     On August 6, 2009, Princeton Review issued a press release reporting its financial results for the second quarter of 2009.  For the six months ended June 30, 2009, the Company reported that revenues increased 9.3% to $76.3 million, from $69.8 million in the six month period ended June 30, 2008. In the press release, Defendant Perik commented on the Company's results, stating:

> Our revenue growth for the six months ended June 30, 2009, while positive, has been negatively affected by continuing macro-economic challenges and industry pricing pressures. Despite this our earnings growth reflects the continued effective execution of our strategy. Both our test prep and supplemental educational services businesses are subject to seasonality and a greater proportion of our first half revenues fell in our first quarter this year as opposed to our second quarter. This was especially true for our SES division. Our test prep enrollments are up, which we believe is an indicator that consumer awareness of The Princeton Review and our overall brand presence in the marketplace continues to grow.

30.     On August 6, 2009, the Company held a conference call to discuss the Company's financial results. During the call, Defendant Perik spoke positively about the Company's outlook, stating:

> Given where we are at this point in the year, I think I am in a position to be able to give investors a pretty good view of management's belief of where fiscal 2009

is going to end up. We are now at a point in the year, we have good visibility on where things should be on December 31 and I want to share that perspective with you.

The Princeton Review's financial performance in 2009 has been driven by three major factors. The first is year-over-year pricing trends, the second is enrollment trends and the third is the shift between tutoring and retail courses with our customers.

Ever since the economy turned last summer, we have seen our clients migrate to lower-cost products in our system. Obviously as prices come down, that's put pressure on margins. We had said in previous calls that our goal had been to grow enrollments at a rate that would help offset that margin impact.

Q1 successfully did that, did it because, in that quarter, enrollment growth outpaced the price decline. Q2 was less successful in mitigating the impact. We had enrollment growth but at a lesser rate than the average prices fell by. We expect that the back half of the year will be more successful in that, in this vein. Our confidence in saying that is right now with almost 80% of our annual retail enrollment book, we expect to see the last half of the year as essentially flat in dollars in our retail business, but high single digit enrollment growth.

* * *

Now, investors need to remember that there is a lag between when we book a tutoring customer and when we ultimately recognize that revenue. And that lag can be measured in several months. I am able on this call, however, to report that we have seen that shift that started last summer and last fall away from tutoring, start to slow its decline in recent months and, frankly, come very close to flattening out if not turning around in the right direction. And that is a bullish sign for the balance of the year.

Speaking of the balance of the year, the Company is giving guidance today of annual revenue growth between 7 and 10% in a range of EBITDA profitability before restructuring between 10 and 13%. Such guidance essentially assumes behind it that our test prep business will be essentially flat organically in the back end of the year.

Now as of today, when we look at our retail bookings in the third and fourth quarters, that is exactly what we are seeing right now. They are essentially flat. Our tutoring booking as I mentioned earlier has reversed course recently and then the last few weeks it actually started to trend upwards – particularly in the first part of August.

We think that this is frankly a sign of an improved economy and something that will benefit from. So, overall, if the business continues to trend as it is trending today, we will end up at a minimum doubling our EBITDA before our

restructuring charges that we announced earlier in the year on a year-over-year basis.

31.     On September 24, 2009, Princeton Review filed a Form S-3 registration statement on Form S-3 with the SEC that authorized the Company, from time to time, to offer and sell up to $75 million of any combination of preferred stock, common stock, units and warrants.

32.     On November 5, 2009, the Company held a conference call to discuss its financial results for the third quarter of 2009. During the call, Defendant Perik represented the following with respect to the Company's turnaround and improvements:

> Thank you, Steve. Well, I have a few headlines that I hope investors will take away from this call today. First, it is that the turnaround has worked. The clearest evidence of this is the significant cash flow we have generated this year. We've used it to pay down our debt, used it to invest in better systems and in new online products.
>
> Secondly, we are seeing real improvements in the test prep marketplace. Remember, the revenue we are reporting today reflects decisions that consumers made last spring. And in the second quarter, which was a challenging one for us, the revenue we were reporting then were decisions that people had made back in the winter, when the economy was particularly bleak.
>
> Today, consumers are making decisions – buying our tutoring services and our retail businesses – which clearly show us that things have bottomed out. And in fact, we have had a positive reversal of trend lines. So the revenue that we book today with our customers will end up being reported to investors early next year or into the spring of next year. So there's a long lead time between when you get visibility on it and when we get visibility on it.
>
> A part of this improvement, I think, is driven by economic conditions; but frankly, I think our new strategies are working, both from a product and a marketing perspective, and I think we are gaining market share over our competition.

33.     On March 11, 2010, Princeton Review issued a press release announcing its financial results for 2009.  For the year, the Company reported that revenue was $143.5 million,

an increase of 3.4% from $138.8 million in 2008.   In the press release, Defendant Perk commented on the Company's financial results, stating:

> We are pleased that the end of 2009 marks the beginning of a new phase of The Princeton Review's transformation. Over the past two and a half years, we have evolved from a test preparation and SES tutoring business to a diversified educational services company with test preparation, post secondary education and career education businesses. Our financial results reflect this transformation and as of January 2010, we have two primary businesses of equal scale, both with strong brand recognition in their respective markets.

34.     On May 6, 2010, Princeton Review issued a press release announcing its financial results for the first quarter of 2010.  The Company reported a 41% increase in revenues to $63.2 million, up from $44.8 million in the same period in 2010.  Defendant Perik commented on the financial results, stating as follows:

> Our financial performance in the first quarter demonstrates that we are continuing the transformation process for The Princeton Review. That momentum carried through into April when we successfully issued 16.1 million shares of common stock, raising sufficient proceeds to pay off our bridge facility relating to the Penn Foster acquisition. The positive impact of these changes in our capital structure provides us with further financial flexibility to execute on our strategies, and to continue improving the growth characteristics of our core test prep and online career educational services businesses.

35.     On June 4, 2010, Steven C. Richards, the Company's then COO and CFO, resigned from the Company, effective June 30, 2010. On June 7, 2010, the Company announced that Richards resigned and that he was being replaced by Christian G. Kasper ("Kaspar") effective August 16, 2010.

36.     On August 5, 2010, the Company issued a press release announcing its financial results for the second quarter of 2010. The Company reported that total revenue in the second quarter of 2010 increased 79% to $56.2 million from $31.5 million reported in the same year-ago quarter. In the press release, Defendant Perik commented on the financial results, stating:

Our test prep business has improved and Penn Foster continues to steadily grow, demonstrating the strength of our core businesses. On the test prep side, our 55% growth in the institutional channel has begun to validate the opportunity for our company to reach a differentiated customer segment. Increasing Federal money for college readiness programs underscores the opportunity within this market segment.

The integration of the Penn Foster business is tracking well, and we have achieved approximately $3 million in cost savings based upon actions taken to date. We expect the integration and restructuring to eventually achieve cost savings in the $4-$6 million range on a run-rate basis.

Our new business ventures in post secondary education with the AFL-CIO and Massachusetts community colleges continue to progress. This week, for instance, we are launching our first statewide marketing relationship with the Rhode Island Institute of Labor Studies and Research that will offer more than 25 of our certificate and associate degree programs starting this fall. At Bristol Community College in southern Massachusetts, our allied health care programs have begun their first enrollments for three degree programs commencing in October. It's exciting to see these initiatives begin to take in enrollments, bringing affordable and accessible education to America's working families.

37.    On November 5, 2010, the Company issued a press release announcing its financial results for the third quarter of 2010.  The Company reported that total revenue in the third quarter of 2010 increased 59% to $54.4 million from $34.3 million in the prior year period. The increase was attributable to $23.4 million in revenues generated by the company's Penn Foster division acquired in December 2009. The Company reported adjusted net income and earnings per share below consensus estimates from analysts by 86.2% and 38.2%, respectively. In the press release, Defendant Perik commented on the results, stating:

Our results in the third quarter reflected a more cost-conscious retail test prep customer, but it was also a period of pursuing new and greater opportunities in other market segments, including online, institutional, and our Community College Partnerships. We believe these efforts will result in greater, more predictable and profitable revenues as these plans come to fruition.

38.     The market was shocked by this announcement, and Princeton Review's stock price declined 8.82% from $1.70 per share to close at $1.55 per share on November 5, 2010, and then dropped another 23.23% on November 8, 2010, to close at $1.19 per share.

39.     The statements referenced above in ¶¶24-30, 32-34, 36-37 were materially false and/or misleading when made because they failed to disclose and misrepresented the following material adverse facts, which were known to Defendants or recklessly or negligently disregarded by them: (a) the Company's revenues and earnings were negatively impacted by operational problems and increased competition; (b) the Company shifted its focus and resources away from core higher education readiness to unproven projects to the detriment of the business; (c) contrary to the Company's public statements, the Company was not executing well on its turn-around plan; (d) the Company encountered significant problems in the higher education readiness business due to a product mix shift and increased competition; and (e) defendants' positive statements about the Company were materially false and misleading.

40.     On March 9, 2011, the Company announced that Defendant Perik resigned on March 8, 2011 and that the Board appointed John M. Connolly ("Connolly") as Interim President and CEO. That same day, the Company announced its financial results for the fourth quarter and full year of 2010. For the full year 2010, loss from continuing operations was $50.4 million, compared to a loss of $13.9 million in 2009.

41.     On March 10, 2011, Princeton Review held a conference call to discuss the earnings announcement for 2010. In the conference call, Connolly made the following statements:

> There is a clear path forward that we will communicate to our shareholders, and we're very excited about our prospects. During my time as Interim CEO, my focus will be on the following four areas – one, addressing a number of strategic and operational issues across the Company; two, prioritizing our efforts in

addressing the market opportunities in our core Higher Ed Readiness and Penn Foster businesses; three, clearly communicating to our shareholders our direction and our priorities and where we see growth originating and how investors can measure this growth moving forward; and lastly, leading the search for a permanent President and CEO in the months ahead.

\* \* \*

Beginning with the higher education readiness business, a product mix shift in this segment, along with the dynamic competitive marketplace, made for a very challenging year in 2010. Despite this year of transition, we continue with our repositioning of this business.

\* \* \*

However, our path forward is clear. We will return to our roots as a differentiated branded player at a premium price point, leveraging our strengths in quality teaching, tangible results and experience. And let me note, we will be much more aggressive in how we sell our value proposition into this marketplace.

\* \* \*

And lastly, (technical difficulty) if we look at the world, the world has been moving very much to online activities across so many different areas. And one of the things that we are going to be doing a lot around here is how do we build out that capability, how do we leverage new solutions, how do we attack the institutional marketplace, how do we go into new markets domestically, and the list goes on.

42.     On the same conference call, Kasper described the reasons for a major decrease in the Company's revenues and stated:

Despite over a 4% increase in total course enrollments, revenues were down as customers opted for lower-priced product offerings. We expect this trend to diminish in 2011 as we anniversary the introduction of our lower-priced SAT course offering first introduced in November 2009 and as we reduce our emphasis on discounting practices.

43.     In reaction to the Company's announcements on March 9 and 10, 2011, the price of Princeton Review stock significantly declined. Princeton Review stock dropped 37.80% from $0.82 per share to $0.51 per share on March 10, 2011 and then declined another 23.53% on

March 11, 2011, to close at $0.39 per share. The stock continued to drop thereafter, and as of August 4, 2011, it closed at $0.20 per share.

44.     On April 1, 2011, the Company announced that on March 29, 2011, Princeton Review received a deficiency letter from the NASDAQ stating that, based on the closing bid price of the Company's listed securities for the last 30 consecutive business days, the Company no longer meets the minimum $1.00 per share requirement for continued listing on NASDAQ under Marketplace Rule 5450(a)(1). Under Marketplace Rule 5810(c)(3)(A), the Company has a grace period of 180 calendar days, or until September 26, 2011, in which to regain compliance with the minimum bid price rule.

45.     As a result of Defendants' breaches of fiduciary duty and other misconduct described above, the price of the Company's stock still has not recovered and, as of August 4, 2011, closed at $0.20 per share.

46.     Defendants' breached their fiduciary duty by causing the Company to issue materially false and misleading statements and omit material facts, resulting in a loss of significant Company value and exposing Princeton Review to federal securities violations.  As a result of defendants' wrongful acts and omissions, Company is now exposed to millions of dollars in defense costs and potential liability.

## **DEFENDANTS' DUTIES**

47.     By reason of their positions as directors of the Company, and because of their ability to control the business, corporate, and financial affairs of the Company, the defendants owed the Company the duty to exercise oversight, due care and diligence in the management and administration of the affairs of the Company, including ensuring that the Company operated in compliance with all applicable federal and state laws, rules and regulations.  To discharge these

duties, defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and corporate affairs of the Company.  By virtue of these duties, defendants were required, *inter alia*, to:

a. Manage, conduct, supervise, and direct the employees, businesses and affairs of the Company in accordance with laws, rules and regulations, and the charter and by-laws of the Company;

b. Ensure that the Company did not engage in imprudent or unlawful practices and that the Company complied with all applicable laws and regulations and to become and remain informed as to how the Company was, in fact, operating;

c. Remain informed as to how the Company was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including, but not limited to, maintaining and implementing adequate operational controls;

d. Preserve and enhance the Company's reputation as befits a public corporation;

e. Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner; and

f. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

48. Defendants, because of their positions of control and authority as directors and/or officers of Princeton Review, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Princeton Review, each of the defendants had knowledge of material non-public information regarding the Company.

49. To discharge their duties, the officers and directors of Princeton Review were required to exercise reasonable and prudent supervision over the management, policies, practices

and controls of the Company.  By virtue of such duties, the officers and directors of Princeton Review were required to, among other things:

    a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

50.    Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Conduct"), each of the defendants was required to ensure that "all disclosures made by [Princeton Review] to its stockholders or the investment community should be accurate and complete, and the financial information included therein should fairly present in all material respects the [Princeton Review]'s financial condition, results of operations and cash flows, and such disclosures should be made on a timely basis as required by applicable laws and regulations."

51.    Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to review and discuss with management the annual and quarterly financial statements and earnings press releases; and consider the effectiveness of the Company's internal control over financial reporting and their disclosure controls and procedures.

52.    The conduct of the defendants complained of herein involves a knowing and culpable violation of their obligations as directors of Princeton Review, the absence of good faith on their part, and a knowing or willful disregard for their duties to the Company and its shareholders and a breach of their fiduciary duty of loyalty, good faith, oversight, and diligence

in management and administration of its affairs that the Defendants were aware posed a risk of serious injury to the Company.

## DERIVATIVE AND DEMAND ALLEGATIONS

53.     Plaintiff brings this action derivatively in the right and for the benefit of Princeton Review to redress the breaches of fiduciary duty and other violations of law by defendants.

54.     Plaintiff will adequately and fairly represent the interests of Princeton Review  and  its shareholders in enforcing and prosecuting its rights.

55.     The Board currently consists of the following seven (7) individuals: defendants Lowenstein, Crisan, Katzman, Krupka, Schnabel, Warnock, and Whitlock.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act.

56.     Each of these directors has been named as a defendant in this action and was a director during the time period when Princeton Review engaged in the improper conduct alleged herein.

57.     The defendants owed a duty to Princeton Review and its shareholders to be reasonably informed about the business and operations of the Company.  The defendants completely abdicated their oversight duties to the Company by failing to implement internal procedures and controls necessary to prevent the wrongdoing alleged herein.

58.     Plaintiff did not make a demand on the Princeton Review Board prior to instituting this action because the wrongful acts complained of herein evidence a pattern of conduct showing a wholesale abandonment of their fiduciary duties, including the duty to exercise oversight, due care, and diligence.

59.     These acts, which demonstrate a pattern of misconduct, were not, nor could they have been, the product of a valid or good faith exercise of business judgment.

60.     Demand is also excused because a demand would be a futile, wasteful and useless act as every member of the Board permitted false and misleading statements to be made in SEC filings, thereby abdicating their fiduciary duties to the Company, and severely damaging the Company.  Therefore, every member of the Board faces a substantial likelihood of liability for their breaches of fiduciary duties.

61.     Demand is excused because a demand would be a futile, wasteful and useless act as defendants issued a series of materially false and/or misleading statements in which they failed to disclose, among other things that: (a) the Company's revenues and  earnings were negatively impacted by operational problems and increased competition; (b) the Company shifted its focus and resources away from core higher education readiness to unproven projects to the detriment of the business; (c) contrary to the Company's public statements, the Company was not executing well on its turn-around plan; (d) the Company encountered significant  problems in the higher education readiness business due to a product mix shift and increased competition; and (e) defendants' positive statements about the Company were materially false and misleading.

62.     Demand is excused because a demand would be a futile, wasteful and useless act as to defendants Lowenstein and Whitlock, as each served as members of the Audit Committee and breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's press releases and other disclosures and failed to ensure that adequate internal controls were in place.

## COUNT I

## AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

63.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

64.     As alleged in detail herein, each of the defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Princeton Review disseminated accurate, truthful and complete information to its shareholders.

65.     Each of the defendants also had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP,  and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

66.     Defendants owed and owe Princeton Review fiduciary obligations.  By reason of their fiduciary relationships, defendants specifically owed and owe Princeton Review the highest obligation of good faith, fair dealing, loyalty and due care.

67.     Defendants violated their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision by causing or allowing the Company to disseminate to Princeton Review shareholders materially misleading and inaccurate information through*, inter alia*, SEC filings and other public statements and disclosures as detailed herein.

68.     Defendants violated their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision by failing to ensure that the Company's financial statements were prepared in accordance with GAAP,  and, when put on notice of problems with

the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

69.     Defendants violated their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision by willfully ignoring the obvious and pervasive problems with Princeton Review's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

70.     Defendants violated their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision by abandoning and abdicating their responsibilities and duties with regard to prudently managing the businesses of Princeton Review in a manner consistent with the duties imposed upon them by law.

71.     These actions could not have been a good faith exercise of prudent business judgment.

72.     As a direct and proximate result of defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

73.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

74.     By their wrongful acts and omissions, the defendants were unjustly enriched at the expense of and to the detriment of Princeton Review.

75.     Plaintiff, as a shareholder and representative of Princeton Review, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and

each of them, from their wrongful conduct and fiduciary breaches.

## COUNT III

## AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

76.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

77.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Princeton Review, for which they are legally responsible.    In particular, defendants abused their positions of authority by causing or allowing Princeton Review to misrepresent material facts regarding its financial position and business prospects.

78.    As a direct and proximate result of defendants' abuse of control, Princeton Review has sustained significant damages.

79.    As a result of the misconduct alleged herein, defendants are liable to the Company.

80.    Plaintiff, on behalf of Princeton Review, has no adequate remedy at law.

## COUNT IV

## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

81.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

82.    Defendants had a duty to Princeton Review and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Princeton Review.

83.    Defendants, by their actions and by engaging in the wrongdoing described

herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Princeton Review in a manner consistent with the duties imposed upon them by law.   By committing the misconduct alleged herein, defendants breached their duties of due care, diligence and candor in the management and administration of Princeton Review's affairs and in the use and preservation of Princeton Review's assets.

84.      During the course of the discharge of their duties, defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet defendants caused  Princeton Review to engage in the scheme complained of herein which they knew  had an unreasonable risk of damage to Princeton Review, thus breaching their duties to the Company.  As a result, defendants grossly mismanaged Princeton Review..

## COUNT V

## AGAINST ALL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

85.      Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

86.      As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, defendants have caused Princeton Review to incur (and Princeton Review may continue to incur) significant legal liability and/or legal costs to defend itself as a result of defendants' unlawful actions.

87.      As a result of this waste of corporate assets, defendants are liable to the Company.

88.      Plaintiff, on behalf of Princeton Review, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Against all defendants and in favor of the Company for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duties;

B. Directing Princeton Review to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

C. Awarding to Princeton Review restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: August 10, 2011

LEVI & KORSINSKY, LLP

By: /s/Shannon L. Hopkins
Shannon L. Hopkins (BBO # 657485)
30 Broad Street, 15th Floor
New York, New York 10004

24

Tel: (212) 363-7500
Fax: (212) 363-7171

***Attorneys for Plaintiff***

## VERIFICATION

I, Eric Golden, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing compliant, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Dated: August 8th, 2011

_____
Eric Golden